**DATATREND, INC., Plaintiff,**

v.

**JABIL CIRCUIT, INC., Defendant.**

**Civil Action No. 95–11764–DPW.**

United States District Court, D. Massachusetts.

Jan. 14, 1998.

Joshua C. Krumholz, Sherburne, Powers & Needham, Boston, MA, for Plaintiff and Counter–Defendant.

Charles D. Bavol, Bavol & Associates, P.A., Tampa, FL, for Defendant.

Joseph P. Messina, Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C., Boston, MA, for Defendant and Counter-Claimant.

Audrey B. Rauchway, Bavol & Associates, P.A., Tampa, FL, for Defendant.

Henry A. Sullivan, Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C., Boston, MA, for Defendant and Counter-Claimant.

Christopher J. Trombetta, Sherburne, Powers & Needham, Boston, MA, for Plaintiff and Counter-Defendant.

## ORDER OF ADOPTION

WOODLOCK, District Judge.

The recommendations contained herein are ADOPTED AS ORDERED of this court, there being no opposition and the report's analysis appearing well founded.

## REPORT AND RECOMMENDATION REGARDING (1) DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT (DOCKET NO. 34) AND (2) PLAINTIFF'S CROSS MOTION FOR PARTIAL SUMMARY JUDGMENT (DOCKET NO. 57)

KAROL, United States Magistrate Judge.

This is a case study of the perils that await business persons who enter into substantial commercial transactions on the basis of hastily-prepared contracts.

In January 1995, plaintiff, Datatrend, Inc. ("Datatrend"), agreed to purchase 4,790 surplus notebook computers from defendant, Jabil Circuit, Inc. ("Jabil"), for the total sum of approximately $6,000,000. By April 1995, Jabil had shipped to Datatrend approximately half of those computers, and it had become clear that some (the exact number is disputed) were defective in a variety of ways. On April 24, 1995, both parties signed a memorandum that addressed various aspects of the problem and further defined the parties' rights and duties, but, shortly after the signing, a new problem with the computers emerged. By the end of June 1995, for reasons that are disputed, approximately half of the computers still had not been shipped, and Datatrend had not paid for several hundred that had been shipped following the execution of the April 24, 1995 memorandum. At that time, Datatrend purported to terminate the contract on two grounds: late delivery and poor quality. It then commenced this action against Jabil for breach of contract, breach of warranty, fraud, and violation of Mass.Gen.Laws ch. 93A. In due course, Jabil filed an answer that raised accord and satisfaction as an affirmative defense and asserted counterclaims against Datatrend for, inter alia, breach of contract. Although the January 20, 1995 contract and the April 24, 1995 memorandum are perhaps best described as black holes of ambiguity, both internally and in relationship to one another, both parties now contend in cross motions for partial summary judgment that they are crystal clear and dispositive (in their respective favor, of course) of all of Datatrend's contract and warranty claims. In this respect, both parties are clearly mistaken. Jabil also seeks summary judgment on Datatrend's claim under Mass.Gen.Laws ch. 93A on the ground that the conduct about which Datatrend complains did not occur "primarily and substantially" in Massachusetts. This is a much closer question. For reasons stated below, however, I recommend that Jabil's motion for partial summary judgment on this claim also be denied.

## I. FACTS

The statements filed by the parties pursuant to Local Rule 56.1 disclose that the following material facts are not genuinely in dispute:

1. Sometime in 1994, Jabil, in Florida, manufactured several thousand notebook computers for Epson America, Inc. ("Epson");

2. Epson, after accepting shipment of some of the Jabil-manufactured computers, expressed dissatisfaction with the quality of the computers and refused to accept shipment of the remaining 4,790 units;

3. In January 1995 a broker called Datatrend in Massachusetts and advised its president, Mark A. Hanson ("Hanson"), of the availability of those computers;

4. Hanson spoke by telephone with Jabil's project manager in Florida, Mark Mondello ("Mondello"), and arranged for Mondello to send to him in Massachusetts a sample computer for his inspection and testing;

5. On January 14, 1995, Hanson received in Massachusetts the sample computer that

Mondello had shipped from Florida and, by facsimile to Mondello that same day, asked to meet with Mondello in Florida on January 16th to discuss the possible purchase of those computers by Datatrend; this would give Hanson and his staff two days to inspect and test the sample computer;

6. At a meeting between Hanson and Mondello in Florida on January 16, 1995, Mondello told Hanson that Epson had complained about cracking of the computer's plastic case and that Jabil had corrected the problem;

7. Following the meeting, Hanson returned to Massachusetts and Mondello remained in Florida;

8. On January 20, 1995, Hanson, in Massachusetts, and Mondello, in Florida, each signed a counterpart copy of a two-page agreement (plus exhibits) (hereinafter "January 20 agreement") pursuant to which Datatrend agreed to purchase all 4,970 notebook computers for a total price of $5,937,975;

9. The January 20 agreement, a copy of which, without exhibits, is attached as Appendix A, included: a provision that, subject to a limited grace period, required Datatrend to pay cash for each installment of computers within forty-eight hours of being notified by Jabil that such installment was ready to ship; a provision that gave Datatrend the right to cancel the contract if all computers were not delivered by May 1, 1995; and a section entitled "Warranty" that provided, in pertinent part:

Notebooks Designated by [Datatrend] ... that are Determined to be Dead on Arrival May Be Returned to Jabil for repair or replacement, within 30 days after shipment to [Datatrend].

\* \* \* \* \* \*

Free from any inherent defects and cosmetic flaws.

Catastrophic Failure—In the event that [Datatrend] experiences more then a fifteen percent "catastrophic" field failure rate, within 90 days after delivery to [Datatrend], [Datatrend] will have the option of: Returning the failed product to Jabil for a cash refund, or Returning the failed product to Jabil for repair/replacement.

Upon repair of the returned product, Datatrend will repurchase all product from Jabil for "fair market" value. Jabil has the option of declining Datatrend's repurchase offer and selling the repaired notebook product to another source.

NOTE: A "catastrophic" failure is defined as a latent defect or design flaw inherent in all of the notebook product supplied to Datatrend by Jabil under this agreement, which has caused the "failed" notebooks to become inoperable;

10. In addition to any other ambiguities, the Warranty clause does not state whether the foregoing express warranties are exclusive of all other warranties, express or implied, and it does not say whether the foregoing remedies are exclusive of all other remedies;

11. By internal e-mail dated January 27, 1995, Jabil's "resident plastics expert" told Mondello that the notebooks were not "shippable" due to the possible cracking of certain bezels and the possible failure of certain snaps; Jabil did not disclose this information to Datatrend;

12. By early February 1995, Jabil began shipping computers from its facilities in Florida to Datatrend's facilities in Massachusetts, and Datatrend, in turn, began reselling those computers to its customers;

13. Datatrend soon began receiving complaints from customers concerning a wide variety of electrical and mechanical problems (but apparently not about cracked cases, cracked bezels, or failed snaps). Although the precise extent and nature of the problems is subject to acrimonious dispute (including supportable allegations by Jabil that Datatrend itself deliberately sabotaged some of the product in order to induce Jabil to make contract concessions), the fact that some of the computers were materially defective is not;

14. During February and March 1995, Datatrend, from its facilities in Massachusetts, sent e-mails to and had telephone conversations with Jabil in Florida in which Datatrend expressed concern about what it considered to be an inordinate number of complaints and returns it was receiving from

customers. Datatrend also returned a number of those computers to Jabil for repair;

15. In early April 1995, Jabil sent a team of engineers from its facilities in Florida to Datatrend's facilities in Massachusetts to investigate and discuss the problems that were the subject of Datatrend's customers' complaints;

16. On April 24, 1995, Mondello sent Hanson a one-page memorandum (plus exhibits), the stated "Subject" of which was the "Reset to Jabil/Datatrend Agreement: Dated 1/20/95." Hanson countersigned the memorandum the same date, thereby agreeing to what the memorandum (which, consistent with the parties' nomenclature, shall be referred to as the "reset agreement") characterized as certain "amendments/comments" to the "original business agreement signed on 1/20/95;"

17. The reset agreement, a copy of which, without exhibits, is attached as Appendix B and which, according to Jabil, constitutes an accord and satisfaction entirely discharging Jabil from all contract and warranty claims presently asserted against it by Datatrend, includes an accounting of all shipments, returns, and payments through the date of execution; incorporates a new shipping schedule for the remaining computers, which schedule calls for shipments extending through the end of May 1995; affirms Jabil's agreement to "support Datatrend with all RMAs [i.e., Return Material Authorizations] throughout the buildout of the notebooks;" gives price concessions on future shipments to Datatrend in the total amount of approximately $500,000 (of which $140,000 "relates to units sold by Datatrend as of 3/31/95"); and provides for the reimbursement by Jabil of up to $50,000 of expenses to be incurred by Datatrend for "back end technical field support" to be provided by an "independent company … when required;"

18. In addition to any other ambiguities, the reset agreement does not expressly state what the relationship is between these new remedies and the remedies set forth in the January 20 agreement, and, more importantly, whether the new remedies are in lieu of some or all claims for damages that Datatrend might have for past or future breaches (assuming the January 20 agreement did not already preclude all such claims);

19. By the first week of May 1995, Datatrend was complaining to Jabil about Jabil's failure to resume shipments in accordance with the revised shipping schedule that had been incorporated into the reset agreement and about Jabil's failure to acknowledge Datatrend's requests for shipping information;

20. Sometime in May 1995, Jabil advised Datatrend for the first time that it had recently discovered a reoccurrence of the problem that had resulted in the cancellation of the contract by Epson in 1994, i.e., the cracking of the plastic hinge that secured the top of the computer case to the bottom. Jabil assured Datatrend, however, that it had now indeed discovered and corrected the true cause of the problem (leaking hinge oil which caused the plastic hinge to become brittle) in all computers in its inventory and that it was willing to support a full recall of all computers that Datatrend had already shipped to its customers, so that those computers could be fixed before they, too, developed cracking problems;

21. Datatrend declined Jabil's recall offer, stating that it preferred to handle its customers' hinge-cracking problems on an individual RMA basis, if and when they occurred;

22. Jabil resumed shipment of computers to Datatrend. in the second week of May 1995. By the end of that week, it had shipped to Datatrend approximately 781 computers, consisting of 313 reconditioned computers that Datatrend had previously returned to Jabil for various types of repairs and an additional 468 computers that had never previously been shipped to Datatrend. Jabil claims that all such computers were equipped with new plastic and hinges that had not been exposed to the hinge oil that was believed to be responsible for the cracking;

23. Datatrend accepted these 781 computers; it had previously paid for the 313 computers that it had returned for repairs to

Jabil, but, to this day, it has not paid for the 468 additional computers;[1]

24. In an e-mail message dated May 16, 1995, from Mondello to Hanson, Jabil (a) complained about Datatrend's failure to make payment in accordance with the terms of the January 20 agreement, (b) offered to extend short term credit to Datatrend in an amount not to exceed $500,000, and (c) raised the possibility that it would ship no additional computers "until this [payment] issue is resolved;"

25. Jabil shipped no additional computers to Datatrend;[2]

26. By letter dated June 26, 1995, Datatrend purported to terminate the contract on the ground that Jabil had failed to ship product in accordance with the *original* schedule set forth in the January 20 agreement; it also alluded to Jabil's failure to supply product that was "free from inherent defects ... necessitating the return of many units and further delays and disruption."

Other facts, disputed or otherwise, will be discussed in the context of the specific claim or defense to which they relate.

## II. *SUMMARY JUDGMENT STANDARD*

The standard for summary judgment is familiar. Summary judgment is appropriate only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). At the outset, the moving party must aver that there is an absence of evidence to support the non-moving party's position. *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 48 (1st Cir.1990). To avoid summary judgment, the opposing party must produce affirmative evidence demonstrating a genuine issue for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Mesnick v. General Elec. Co.*, 950 F.2d 816, 825 (1st Cir.1991), *cert. denied*, 504 U.S. 985, 112 S.Ct. 2965, 119 L.Ed.2d 586 (1992). "[T]he nonmovant may not rest upon mere allega-

tions, but must adduce specific provable facts demonstrating that there is a triable issue." *Brennan v. Hendrigan*, 888 F.2d 189, 191 (1st Cir.1989). In reviewing the nonmovant's case, "the court must look at the record in the light most favorable to the party opposing the motion and must indulge all inferences favorable to that party," *Stepanischen v. Merchants Despatch Transp. Corp.*, 722 F.2d 922, 928 (1st Cir.1983); *see Mack v. Great Atlantic & Pacific Tea Co., Inc.*, 871 F.2d 179, 181 (1st Cir.1989), subject, nevertheless, to the caveat that the court "must disregard improbable or overly attenuated inferences, unsupported conclusions, and rank speculation." *Abbott v. Bragdon*, 107 F.3d 934, 938 (1st Cir.1997). Where, as here, the parties have filed cross motions for summary judgment, the two motions must be considered independently, with all inferences drawn in favor of plaintiff with respect to defendant's motion and in favor of defendant with respect to plaintiff's motion.

## III. *DISCUSSION*

For discussion purposes, it is convenient to distinguish between two types of issues: those related to contract and warranty claims (including Counts I–III of Datatrend's Third Amended Complaint, Docket No. 44, and Jabil's affirmative defense of accord and satisfaction) and those related to Datatrend's claim under Mass.Gen.Laws ch. 93A (Count IV of Datatrend's Third Amended Complaint).

### A. *Contract and Warranty Claims*

#### (1) *Statement of the Issue*

Before a court can begin to address the merits of any motion for summary judgment, it must first understand the legal theories that underlie the claims that are the subject of the motion and the specific form of judgment or other relief that the moving party is seeking. Acquiring such understanding is usually not difficult, but, unfortunately, it is a formidable task here.

---

**1.** It is not clear from the summary judgment record whether Datatrend accepted these 781 computers before or after Jabil told it about the newly-discovered hinge oil problem.

**2.** I have found no evidence in the summary judgment record that Datatrend ever requested further shipments.

The exercise begins uneventfully. Both parties seek summary judgment on Counts I–III of Datatrend's Third Amended Complaint, which expressly purport to set forth claims, respectively, for declaratory judgment (that Jabil broke the contract in various respects), breach of contract, and breach of warranty. Jabil's position is straightforward (though, for reasons stated below, incorrect) and easily analyzed under traditional summary judgment principles. It claims that judgment should enter in its favor on all three counts because the reset agreement constituted an accord and satisfaction which discharged all its contract and warranty obligations to Datatrend. Datatrend's motion is far more difficult to understand, in large part because the legal theories underlying most of Counts I–III are so ill-defined.

Count I first sets forth a request for a declaration that Datatrend's "termination of the parties' agreement was justified." (Third Amended Complaint and Jury Demand ¶ 16, attached as Exhibit C to Motion to Amend Complaint for the Third Time, Docket No. 44.) This request is presumably based on the legal theory that, as a matter of substantive law, a buyer has a right to terminate an executory contract when the seller is late delivering goods or the goods, or some portion of them, are non-conforming. Like Jabil's motion for summary judgment on the ground of accord and satisfaction, Datatrend's motion, to this extent, is capable of being analyzed under traditional summary judgment principles. Count I does not end there, however. It goes on to request a further declaration that "under the agreement Datatrend is entitled to a $140,000 credit for defective merchandise purchased prior to March 31, 1995, entitled to a $50,000 credit for back [end] technical support for which Jabil refused to reimburse Datatrend, and obligated to pay only for non-defective product that it received before the date of termination, less a setoff in the amount of Datatrend's damages resulting from Jabil's breaches of contract, breaches of warranties,

and violations of Mass.Gen.Laws ch. 93A." (*Id.*) The legal theories that underlie these further requests are not at all clear.

Presumably, Datatrend's request for a declaration that it is entitled to "a $140,000 credit for defective merchandise purchased prior to March 31, 1995" and "a $50,000 credit for back [end] technical support" is based on the reset agreement. (*Id.*) Datatrend purported to terminate that agreement, however, and, indeed, it seeks a declaration that such termination was proper. Datatrend does not address in its summary judgment papers the question of whether it may continue to demand credits under an agreement that it purported to terminate. Further, it is not at all clear from the reset agreement that the $140,000 credit was to have been for "defective merchandise purchased prior to March 31, 1995," (*id.*), as sought by Datatrend, unless we are to assume that such credit is the equivalent of a credit against "units sold by Datatrend as of 3/31/95," (Reset Agreement, Appendix B), and not yet shipped by Jabil. Equally unclear is the basis upon which Datatrend believes it is entitled to the $50,000 back end support credit, since Datatrend does not even attempt to demonstrate in its summary judgment papers that it hired an independent firm to provide back end technical field support; that such firm billed it for $50,000 (or any other amount); that it sought reimbursement from Jabil; or that Jabil "refused to reimburse Datatrend." (Third Amended Complaint and Jury Demand ¶ 16, attached as Exhibit C to Motion to Amend Complaint for the Third Time, Docket No. 44.) Datatrend's memorandum in support of its cross motion for partial summary judgment (Docket No. 58) sheds no light on Datatrend's position with respect to either credit; indeed, with minor exceptions, it is silent with respect to Datatrend's request for declaratory relief.[3]

Datatrend's request for a declaration that it is "obligated to pay only for non-defective product that it received before the date of

---

**3.** The only references to declaratory judgment found anywhere within Datatrend's memorandum in support of summary judgment, (Docket No. 58), are at page 1, where Datatrend states that it seeks "partial summary judgment on lia-

bility for Count I (Declaratory Judgment)," and at page 4, where Datatrend states, "Nor can there be any dispute that Datatrend was justified in terminating the contract, as raised in the Declaratory Judgment Count."

termination" is equally opaque. (Third Amended Complaint and Jury Demand ¶ 16, attached as Exhibit C to Motion to Amend Complaint for the Third Time, Docket No. 44.) Datatrend makes no effort to reconcile this request with the undisputed fact that Jabil apparently repaired and reshipped to Datatrend a significant portion of the defective product; that some of the defective product which was accepted by Datatrend and not returned to Jabil for repair (assuming there was any) presumably had some value, even if less than the full amount that non-defective product would have had; and that the reset agreement, which Datatrend purported to terminate, would have given Datatrend a credit in the amount of approximately $500,000, presumably as an adjustment for defective product. Again, because Datatrend's summary judgment papers are virtually silent regarding Datatrend's request for declaratory relief, they shed no light on these issues.

Finally with respect to Count I, it is not clear what Datatrend is asking for in its request for a declaration that the amount it owes for non-defective product be reduced by "a setoff in the amount of Datatrend's damages resulting from Jabil's breaches of contract, breaches of warranties, and violations of Mass.Gen.Laws ch. 93A." It goes without saying that, at the end of the case, the factfinder will have to tally the debits and credits on both sides of the ledger and render a final accounting. This is the same task that the factfinder must undertake in every case in which offsetting claims are asserted. If Datatrend is asking for nothing more than this, it is certainly entitled to the declaration it seeks, but to say this is to state the obvious. If, on the other hand, Datatrend is asking for something other than this, its Third Amended Complaint and summary judgment papers are not sufficiently specific to enable a court to render a meaningful decision.

In sum, Count I and the summary judgment memorandum that Datatrend filed in support of it present only one claim with sufficient clarity to be the subject of meaningful summary judgment consideration, that claim being Datatrend's request for a decla-

ration that "its termination of the parties' agreement was justified."

Count II of Datatrend's Third Amended Complaint purports to be a straightforward claim for "breach of contract." Closer inspection, however, discloses no fewer than six distinct claims subsumed within it. Specifically, Datatrend contends in Paragraph 18 that "Jabil's failure to provide various credits to Datatrend, late delivery of numerous units, its notification that it would not deliver in accordance with the parties' agreement, and the other actions set forth in Paragraphs 12 and 13 above, constitute material breaches of the agreement between Datatrend and Jabil." Paragraph 12, in turn, complains about Jabil's "failure to repair and return 36 defective units worth approximately $36,750;" "failure to return 2 pieces of equipment worth approximately $2,215;" "overcharging Datatrend $500;" shorting Datatrend $7,000 worth of product in one shipment; and "failure to credit Datatrend for returned units worth approximately $20,000." Finally, Paragraph 13 alleges that Jabil somehow caused Datatrend to become involved in a copyright dispute with Epson, at a cost to Datatrend in excess of $15,000.

Datatrend's Cross Motion for Partial Summary Judgment (Docket No. 57) purports to seek summary judgment as to the whole of Count II, without differentiating among its various parts. Yet, there is not a word in Datatrend's summary judgment memorandum (Docket No. 58) concerning most of the discrete claims subsumed within Count II. The court cannot and will not give consideration to any claim that Datatrend does not discuss. To the extent Datatrend's memorandum purports to discuss Count II at all, it does so in Section I at pages 2–4, but all it says in those few pages is that, contrary to the warranty and shipping schedule set forth in the January 20 agreement, the product was not "free from any inherent defects and cosmetic flaws" and was not all delivered by May 1, 1995. Datatrend's claim for "inherent defects and cosmetic flaws" is essentially a claim for breach of express warranty. Therefore, it will be discussed below within the context of Count III, which deals with Datatrend's breach of warranty claims, ex-

.

press and implied. This leaves the claim for late delivery as the only part of Count II that must be considered with respect to Datatrend's motion for summary judgment.

Thus far, it appears that two claims within Counts I and II are viable candidates for summary judgment consideration: a claim for declaratory judgment that Datatrend was entitled to terminate the agreement and a claim for breach of contract based on Jabil's failure to complete delivery by May 1, 1995. In fact, however, these two claims are essentially the same, in that Datatrend contends in its memorandum that it was the late delivery of product that entitled it to terminate the agreement. (Memorandum of Law in Support of Plaintiff's Cross Motion for Partial Summary Judgment at 4, Docket No. 58 (asserting that "[t]he contract gave Datatrend the right to terminate the contract if all product was not delivered by May 1, 1995").) Thus, as far as Counts I and II are concerned, Datatrend's motion reduces to a request for summary judgment on the claim that Datatrend was entitled to terminate the agreement due to Jabil's failure to complete delivery by May 1, 1995.

This brings us to Count III, in which Datatrend asserts claims for breach of express warranty, breach of the implied warranty of merchantability, and breach of the implied warranty of fitness for a particular purpose.[4] The fitness warranty may be disregarded, however, since Datatrend's summary judgment memorandum does not discuss it at all. With respect to express warranties and the implied warranty of merchantability, Datatrend plausibly contends, *inter alia*, that the computers had an "inherent defect," at least to the extent their plastic cases were apt to

crack as a result of exposure to hinge oil, and that Datatrend experienced an unusually high rate of returns.[5] Datatrend does not explain, however, how a high (as distinguished from a normal or even low) rate of return relates to the existence, *vel non*, of a breach of express warranty or of the implied warranty of merchantability as to any particular unit. Nor is it clear whether its claim is based on the cracking of the plastic case in particular or on all the returns that it experienced for all reasons. Perhaps most importantly, Datatrend never specifies the precise form of relief it is seeking.

On the one hand, Datatrend may be asking for nothing more than a declaration that some unknown number of computers (or all of them, notwithstanding that Jabil claims to have discovered and corrected the cracking plastic problem before more than half the computers had been shipped) had one or more defects that constituted a breach of express warranty or made one or more computers unmerchantable. If so, it would be difficult to see how such declaration, even if Datatrend were otherwise entitled to it, would serve any useful purpose. After all, a trial would still be required in order to answer such fundamental questions as which computers were subject to which defects; did Datatrend sabotage some of the computers and, if so, to what extent; which defects render a computer unmerchantable and which do not; was the warranty of merchantability waived as to any particular defect pursuant to Mass.Gen.Laws ch. 106, § 2–316(3)(b);[6] was the express warranty or the warranty of merchantability waived with respect to the cracking plastic problem when Datatrend rejected Jabil's offer to recall and repair at its expense all computers that were

4. Although breach of express warranty is the subject matter of Count III, Datatrend discusses this claim in Section I of its memorandum, which deals with Count II.

5. Although the cracking of the computer's plastic case would appear to be an "inherent defect" or at least a "cosmetic flaw" within the meaning of the express warranty set forth in the January 20 agreement, it is less clear whether it would also be a "catastrophic failure," since a catastrophic failure is a "latent defect or design flaw ... which has caused the 'failed' notebooks to become *inoperable*." (January 20 Agreement, Appendix A (emphasis added).) Datatrend does not

address the factual issue of whether computers whose plastic cases crack are thereby rendered "inoperable."

6. Massachusetts General Laws Chapter 106, § 2–316(3)(b) provides, in pertinent part, that "when the buyer before entering into the contract has examined the goods or the sample or model as fully as he desired ... there is no implied warranty with regard to defects which an examination ought in the circumstances to have revealed to him." Mass.Gen.Laws ch. 106, § 2–316(3)(b) (West 1990).

already in the field; had one or more computers as to which Datatrend withheld payment already been the subject of a successful warranty repair offered by Jabil and accepted by Datatrend; did Jabil's breach of warranty as to one or more particular computers cause identifiable injury to Datatrend and, if so, in what manner and to what extent; and were Datatrend's remedies for such breach limited by the January 20 agreement or superceded, in whole or in part, by the reset agreement. Because a declaration that some unknown number of computers were subject to one or more defects that made those particular computers nonconforming or unmerchantable would not materially shorten the trial or advance the case toward resolution, I do not construe Datatrend's motion as requesting such relief. In the alternative, if that is the relief that Datatrend is requesting, I would recommend that partial summary judgment as to this claim be denied for prudential reasons. *See* Fed.R.Civ.P. 56(d) (court need not ascertain and specify which "material facts exist without substantial controversy" unless it would be "practicable" to do so); *Rhode Island v. Narragansett Indian Tribe,* 19 F.3d 685, 693 (1st Cir.) (stating that, when considering whether a case is ripe for declaratory judgment, a court must consider, *inter alia,* whether granting relief would "serve a useful purpose" or "be of practical assistance in setting the underlying controversy to rest"), *cert. denied,* 513 U.S. 919, 115 S.Ct. 298, 130 L.Ed.2d 211 (1994), *citing Step–Saver Data Systems, Inc. v. Wyse Technology,* 912 F.2d 643, 647 (3d Cir. 1990).

More plausibly, Datatrend may be asking for partial judgment or a declaration to the effect that the breaches of warranty, express and implied, were, in the aggregate and without regard to their impact on the shipping schedule, sufficiently severe, taking into account all the defects and the high rate of return, to justify Datatrend's cancellation of the contract. This approach is certainly suggested by the supplemental memorandum that Datatrend filed at the court's suggestion, following the hearing on the cross motions for summary judgment. (Supplemental Memorandum in Support of Plaintiff's Cross Motion for Partial Summary Judgment Re

Field Failure Rates at 3–5, Docket No. 89.) Because this is the only formulation that makes sense in the context of this case, I shall assume that the judgment Datatrend is seeking at the summary judgment stage based upon Jabil's purported breaches of warranty, express and implied, again reduces to a request for a declaration to the effect that the defects were so severe and extensive that Datatrend was entitled to terminate the contract.

Summarizing to this point, the legal issue raised by Datatrend's motion for summary judgment as to Counts I–III can be restated as follows: based upon the undisputed facts set forth in the summary judgment record, did Datatrend have a right as a matter of law to terminate the January 20 agreement and (or including) the reset agreement, due to (1) Jabil's failure to complete all shipments by May 1, 1995, or (2) the cumulative effect of Jabil's alleged breaches of warranty, express and implied?

### (2) *Analysis of Contract Issues Presented in Datatrend's Motion*

There is no need to dwell on the first of the two questions—whether Jabil's failure to complete all shipments by May 1, 1995, gave Datatrend the right to terminate the contract. Datatrend conceded at the hearing on the cross motions for summary judgment, and properly so, that facts which have a bearing on that issue are genuinely disputed. (Tr. of June 10, 1997 Hr'g., at p. 96, line 18 to p. 98, line 1.)

Datatrend does not concede, however, that genuine issues of material fact exist with respect to its alternative theory that termination was justified as the result of the severity and pervasiveness of the various breaches of express and implied warranties. Before we can attempt to determine whether any material factual disputes exist within the context of this theory, we must, of course, have an understanding of the substantive law on which this theory is based. The legal support for such theory, to the extent Datatrend provides any, is outlined in Datatrend's Supplemental Memorandum as follows:

With respect to a breach of contract claim ... even where the breach is less than "total," a buyer may recover damages with respect to the whole contract "if the breach goes to the whole contract...." [UCC] § 2–711(1). "The buyer's right to proceed as to all goods when the breach is as to only some of the goods is determined by the section on breach and installment contracts...." *Id.,* UCC cmt. 1. Installment contracts are subject to § 2–612 which provides, in part, that "[w]henever non-conformity or default with respect to one or more installments substantially impairs the value of the whole contract there is a breach of the whole." § 2–612(3).

(Supplemental Memorandum in Support of Plaintiff's Cross Motion for Partial Summary Judgment re Field Failure Rates at 3, Docket No. 89 (citations and footnote omitted).)

Putting aside the question of whether this is an accurate synopsis of relevant law with respect to damages, it is certainly a materially incomplete statement of the law with respect to the buyer's right to cancel.[7] Specifically, the statute, in pertinent part, in fact provides:

> Where the ... buyer rightfully rejects or justifiably revokes acceptance then with respect to any goods involved, and with respect to the whole if the breach goes to the whole contract (section 2–612), the buyer may cancel....

Mass.Gen.Laws ch. 106, § 2–711(1). Datatrend does not address the question whether it rejected Jabil's goods or revoked acceptance, let alone whether its rejection was "rightful" or its revocation "justifiable." *See, generally,* Mass.Gen.Laws ch. 106, §§ 2–601, 2–602, 2–603, 2–606, 2–607, 2–608 (West 1990). Therefore, it is impossible to say whether there are any disputed issues of fact regarding Datatrend's right to cancel under § 2–711. Indeed, even if it is assumed that

there was a rightful rejection or justifiable revocation of acceptance, Datatrend would only have had the right to cancel the contract if there were a breach which "goes to the whole," within the meaning of Mass.Gen. Laws ch. 106, § 2–612. That section of the Code provides, in pertinent part:

> Whenever the non-conformity ... with respect to one or more installments substantially impairs the value of the whole contract there is a breach of the whole. But the aggrieved party reinstates the contract if he accepts a non-conforming installment without seasonably notifying of cancellation or if he ... demands performance as to future installments.

Mass.Gen.Laws ch. 106, § 2–612(3) (West 1990). Again, since Datatrend does not address the subject, we can only speculate about whether any defects in "one or more installments" of computers "substantially impaired the value of the whole contract." Ordinarily, this would be a question of fact. *Cf. Hastings Associates, Inc. v. Local 369 Building Fund, Inc.,* 42 Mass.App.Ct. 162, 675 N.E.2d 403, 411 (stating that material breach of contract by one party relieves other party of any further performance obligations and that whether breach is material is fact issue for jury), *rev. denied,* 424 Mass. 1108, 678 N.E.2d 1334 (1997). There is no reason why it should not be so here, where Datatrend arguably received substantial revenue from the resale of the computers and Jabil was arguably willing and able to effect repair of all the problems identified by Datatrend. Further, it is at least arguable that Datatrend accepted non-conforming goods both before and after the reset agreement and may, in either case, have "demand[ed] performance as to future installments," thus raising additional issues of fact (and law) about whether Datatrend "reinstate[d] the

---

**7.** With respect to damages, the Uniform Commercial Code, which appears as Chapter 106 of Massachusetts General Laws, provides that, under certain circumstances, if a seller's breach goes to the whole contract, a buyer may "recover[ ] so much of the price as has been paid," as well as " 'cover' and have damages ... as to all the goods affected ..." and, in addition, "recover damages for non-delivery...." Mass.Gen. Laws ch. 106, § 2–711(1), (1)(a), (1)(b) (West

1990). Whether this is equivalent to permitting the buyer to "recover damages with respect to the whole contract," (Supplemental Memorandum in Support of Plaintiff's Cross Motion for Partial Summary Judgment re Field Failure Rates at 3, Docket No. 89), is a question we need not address in the context of the pending motion by Datatrend for partial summary judgment only as to liability.

contract" following Jabil's breach. If it did, it might have waived whatever right it would otherwise have had to cancel the contract, although it would still be entitled to damages for the diminished value of any non-conforming goods, *see* Mass.Gen.Laws ch. 106, § 2–714 (West 1990).[8] Much more could be said about this aspect of Datatrend's motion, but it is abundantly clear from what has been said thus far that Datatrend's right to cancel the contract turns on the resolution of a number of material issues of fact that are either genuinely in dispute or not discussed at all. For this reason, I recommend that Datatrend's motion for summary judgment as to Counts I–III be **DENIED**.

(3) *Analysis of Contract Issues Presented in Jabil's Motion*

■ As noted, Jabil's motion for summary judgment as to Counts I–III of Datatrend's Third Amended Complaint (the declaratory judgment, contract, and warranty counts) is based entirely on Jabil's affirmative defense of accord and satisfaction. Specifically, Jabil contends that the reset agreement "superseded," and thus precludes, all contract and warranty claims asserted by Datatrend based on the January 20 agreement. (*See* Corrected Memorandum in Support of Defendant's Motion for Partial Summary Judgment at 2, Docket No. 40.) As Jabil correctly notes in its memorandum at pages 16–17, in order to prevail on such argument, it must establish that (1) the parties entered into the reset agreement with the intention that it was to constitute a complete settlement of an existing dispute and (2) it in fact performed all its obligations under the reset agreement. *See Rust Engineering Co. v. Lawrence Pumps, Inc.*, 401 F.Supp. 328, 333 (D.Mass. 1975).

There is, of course, no express statement in the reset agreement to the effect that it was intended to supersede the January 20 agreement. or constitute a complete settlement of any dispute (let alone of all disputes) arising under it. To the contrary, the parties

state in the reset agreement that it is "amendments/comments [that] shall apply to our original business agreement signed on 1/20/95." This at least implies that the "original business agreement," including all the rights, obligations, warranties, and remedies set forth in it, would remain in effect, except to the extent expressly modified by the reset agreement. A factfinder could perhaps infer a contrary intent from the substance of the reset agreement taken as a whole and the circumstances concerning its execution, particularly evidence to the effect that the parties negotiated the contract concessions in the reset agreement (i.e., the lower price, the credit for back end support, and the new shipping schedule) in response to Datatrend's demand for a resolution of its complaints about shipping delays and product quality. It would not be required to draw such inference, however. It could permissibly conclude, for example, that Jabil offered the concessions in an attempt to mitigate damages or to avoid an immediate cancellation of the contract by Datatrend, or even as a gratuitous gesture of goodwill to smooth the ruffled feathers of a potentially important customer. *See United California Bank v. Eastern Mountain Sports, Inc.*, 546 F.Supp. 945, 960 (D.Mass.1982) (finding that buyer does not necessarily enter into accord and satisfaction by accepting credits from seller for allegedly defective merchandise), *aff'd*, 705 F.2d 439 (1st Cir.1983). Under any of these scenarios, there would be no agreement by Datatrend to accept the concessions offered by Jabil in exchange for a release of its claims, and thus no accord and satisfaction.

■ Further, even if the reset agreement were construed by a factfinder as an accord with respect to some dispute that had arisen between the parties, its scope would be far from clear. For example, does it deal just with the defects that the parties already knew about, or does it also foreclose damage claims based upon defects (such as the cracking of the case due to leaking hinge oil) that

---

**8.** I focus on Datatrend's rights under Mass.Gen. Laws ch. 106, § 2–612(3) not because this is the only possible legal basis upon which a buyer may purport to terminate a contract or suspend its own performance under it, *see, e.g.,* Mass.Gen.

Laws ch. 106, §§ 2–609 (right to adequate assurances of performance), 2–610 (anticipatory repudiation), but because this is the only basis on which Datatrend purports to rely.

had not yet arisen or been disclosed at the time the reset agreement was executed? *See id.* at 961 (finding no accord and satisfaction based, in part, upon fact that buyer was unaware of one particular product defect when it accepted credits for other defects of which it was aware). Again, the reset agreement is, from Jabil's perspective, at best ambiguous, and the resolution of ambiguities in a written agreement is a function reserved for the factfinder. *See Den Norske Bank AS v. First Nat'l Bank of Boston,* 75 F.3d 49, 52, 59 (1st Cir.1996); *NASCO, Inc. v. Public Storage, Inc.,* 29 F.3d 28, 32–33 (1st Cir. 1994).

Finally, of course, there is the overriding question whether the accord, if there was one, was satisfied. It is undisputed that, shortly after the reset agreement was executed, Jabil discovered a previously undisclosed problem with leaking hinge oil. This problem not only jeopardized Datatrend's customer relationships in ways that Datatrend could not have foreseen, but it arguably caused new delays in the revised shipping schedule set forth in the reset agreement itself. At a minimum, Datatrend can plausibly argue to the factfinder that, if there was an accord, it was predicated, among other things, on Jabil satisfying all its new obligations under it, including its obligation to meet the new schedule. Jabil may respond that there were no shipping delays and that, even if there were, either they were immaterial or they resulted from Datatrend's failure to make timely payment for product that was shipped after the reset agreement was executed. Such response, however, would only raise additional issues of material fact that the factfinder would have to resolve.

For all the foregoing reasons, I recommend that Jabil's motion for summary judgment as to Counts I–III of Datatrend's Third Amended Counterclaim and as to Jabil's affirmative defense of accord and satisfaction be **DENIED.**

9. An "unfair or deceptive act or practice" is often defined as conduct that falls "within at least a penumbra of some common-law, statutory, or other established concept of unfairness or [is] immoral, unethical, oppressive or unscrupu-

## B. *Claims Under Mass.Gen.Laws ch. 93A*

Under Massachusetts General Laws Chapter 93A, § 11, a person "who engages in the conduct of any trade or commerce" may bring an action for damages or other relief against another party who, in the course of his trade or business, engages in an "unfair method of competition or an unfair or deceptive act or practice." Mass.Gen.Laws ch. 93A, § 11 (West 1997). In order to sustain an award of damages under Chapter 93A, § 11, the plaintiff must prove that (1) unfair or deceptive acts or practices [9] occurred; (2) those acts or practices occurred "primarily and substantially" in Massachusetts; and (3) the plaintiff suffered a loss of money or property as a result of defendant's unfair or deceptive acts. *See, e.g., Roche v. The Royal Bank of Canada,* 109 F.3d 820, 829 (1st Cir.1997); *Cambridge Plating Co.,* 876 F.Supp. at 336–337, 339. In its motion for partial summary judgment and supporting memorandum, Jabil does not deny that factual issues exist concerning the first and third elements of Datatrend's 93A claim. Rather, Jabil's sole argument is that Datatrend's 93A claim fails to satisfy the second element. Thus, the only issue presented by Jabil's motion is whether Jabil carried its burden of proving that the alleged unfair or deceptive acts did not take place primarily and substantially in Massachusetts. *See* Mass.Gen. Laws ch. 93A, § 11 ("the burden of proof shall be upon the person claiming that such transactions and actions did not occur primarily and substantially within the commonwealth").

In determining whether wrongful conduct occurred primarily and substantially within Massachusetts, the First Circuit has singled out three factors for particular consideration: (1) where the defendant committed the unfair or deceptive conduct; (2) where the plaintiff received and acted upon the unfair or deceptive conduct, and; (3) the situs of the plain-

lous." *Cambridge Plating Co., Inc. v. NAPCO, Inc.,* 876 F.Supp. 326, 336 (D.Mass.1995), *aff'd in part, vacated in part,* 85 F.3d 752 (1st Cir. 1996).

tiff's losses.[10] *See, e.g., Play Time, Inc. v. LDDS Metromedia Communications, Inc.,* 123 F.3d 23, 33 (1st Cir.1997); *Roche,* 109 F.3d at 829; *Clinton Hospital Ass'n v. The Corson Group, Inc.,* 907 F.2d 1260, 1265–1266 (1st Cir.1990). Although no one factor should be determinative in deciding whether conduct occurred primarily and substantially in Massachusetts, the First Circuit has noted that the "critical factor is the locus of the recipient of the deception at the time of reliance." *Clinton Hosp.,* 907 F.2d at 1265–1266. This is because "[t]he victim's ingestion of a deceptive statement and the subsequent effects from reliance on it are what give the deceptive statement its venomous sting." *Play Time, Inc.,* 123 F.3d at 33; *Compagnie De Reassurance D'Ile de France v. New England Reinsurance Corp.,* 57 F.3d 56, 90 (1st Cir.), *cert. denied,* 516 U.S. 1109, 116 S.Ct. 564, 133 L.Ed.2d 490 (1995); *Clinton Hosp.,* 907 F.2d at 1266.

▪ Considering the evidence in the present case in a light most favorable to Datatrend, there are genuine issues of material fact as to whether the allegedly deceptive acts occurred primarily and substantially in Massachusetts. Based upon Datatrend's allegations, the deceptive acts fall into two categories: (1) Jabil's failure to disclose at a meeting in Florida on January 16, 1995, and perhaps in other communications leading up to the signing of the January 20 agreement that the notebook computers were defective, and (2) Jabil's knowing shipment of defective computers into Massachusetts and failure to disclose those defects "in numerous communications to Datatrend in Massachusetts and [at] a site visit." (Plaintiff's Opposition to Defendant's Motion for Partial Summary Judgment at 3–4, Docket No. 56.) Considering first the question of where the defendant committed the first group of acts, as required under *Clinton Hospital,* the alleged misrepresentations and omissions occurred in Florida, while both parties were at the January 16 meeting, or in follow-up communications by Mondello, in Florida, to Hanson, in Massa-

chusetts. The defendant also allegedly committed the second group of acts in Florida, because a "non-disclosure occurs where the defendant who fails to disclose is located," and, in this case, the defendant was always located in Florida, except for one visit to Massachusetts in April 1995. *See Roche,* 109 F.3d at 829–830. Also, because Jabil shipped the computers from its Florida facility to Datatrend in Massachusetts, any shipping of knowingly defective computers would have occurred, for the most part, in Florida. Because Jabil's allegedly deceptive conduct took place in Florida, the first *Clinton Hospital* factor weighs in favor of Jabil.

The analysis does not end here, however. The evidence, viewed most favorably to Datatrend, demonstrates that Datatrend received and acted upon most of the alleged deceptive conduct in Massachusetts. Considering the first group of acts, it cannot be disputed that Datatrend, at least initially, *received* those alleged misrepresentations and omissions while in Florida. Datatrend *acted upon* them for the most part in Massachusetts, however, where it signed the January 20 agreement, received and resold Jabil's computers, received returns from customers, and otherwise dealt with Jabil. Datatrend also *received* and *acted upon* the second group of allegedly deceptive acts in Massachusetts, because it was there that Datatrend *received* the defective computers and *acted upon* Jabil's conduct, again, by reselling the computers to customers, handling customer returns, and communicating with Jabil from Massachusetts. Considering both groups of acts, it thus appears that the "critical" factor of where the plaintiff received and acted upon the alleged deceptions tips in favor of Datatrend.

Finally, if Datatrend suffered any losses (an issue we need not decide), it undoubtedly suffered those losses in Massachusetts. Massachusetts is where Datatrend would have suffered a loss of goodwill, lost profit, and out-of-pocket costs in handling returns of

---

10. A court may also consider other factors, such as: (1) the place of contracting; (2) the place of negotiation of the contract; (3) the place of performance; (4) the location of the subject matter of the contract; and (5) the domicile, residence, nationality, place of incorporation, and place of business of the parties. *Clinton Hosp.,* 907 F.2d at 1263, 1267; *see Boston Hides & Furs, Ltd. v. Sumitomo Bank, Ltd.,* 870 F.Supp. 1153, 1166 (D.Mass.1994).

the defective notebooks. Jabil concedes that "any injury [Datatrend] might have suffered as a result of Jabil's alleged omissions occurred in Massachusetts." (Corrected Memorandum in Support of Defendant's Motion for Partial Summary Judgment at 14, Docket No. 40.) Thus, the third *Clinton Hospital* factor weighs in favor of Datatrend.

Balancing the three *Clinton Hospital* factors, it appears that two out of three weigh in favor of Datatrend.[11] Under First Circuit precedent, this would probably be enough to support a finding that the deceptive conduct, if any, occurred primarily and substantially in Massachusetts. *See, e.g., Clinton Hosp.,* 907 F.2d at 1265–1267 (holding that deceptive conduct occurred primarily and substantially in Massachusetts because plaintiff received and acted upon defendant's deceptive conduct in Massachusetts and plaintiff's losses were suffered there); *Bradley v. Dean Witter Realty, Inc.,* 967 F.Supp. 19, 29–30 (D.Mass.1997) (same). At the very least, Jabil has not met its burden of proving that the alleged deceptions did not take place primarily and substantially in Massachusetts. I therefore recommend that Jabil's motion for summary judgment as to Count IV of Datatrend's Third Amended Counterclaim be **DENIED.**

## IV. *SUMMARY AND RECOMMENDATION*

For all the foregoing reasons, I recommend that (1) Defendant's Motion for Partial Summary Judgment, (Docket No. 34), be **DENIED;** and (2) Plaintiff's Cross–Motion for Partial Summary Judgment, (Docket No. 57), be **DENIED.**

## V. *IMPORTANT NOTICE OF RIGHT TO OBJECT AND WAIVER OF RIGHT TO APPEAL FOR FAILURE TO DO SO WITHIN TEN DAYS*

The parties are hereby advised that under the provisions of Rule 3(b) of the Rules for United States Magistrates in the United States District Court for the District of Massachusetts, any party who objects to these proposed findings and recommendations must file a written objection thereto with the Clerk of this Court **WITHIN 10 DAYS** of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has indicated that failure to comply with this rule shall preclude further appellate review by the Court of Appeals of the District Court's order entered pursuant to this Report and Recommendation. *See United States v. Valencia–Copete,* 792 F.2d 4, 5–6 (1st Cir.1986); *Scott v. Schweiker,* 702 F.2d 13, 14 (1st Cir.1983); *United States v. Vega,* 678 F.2d 376, 379 (1st Cir.1982); *Park Motor Mart, Inc. v. Ford Motor Co.,* 616 F.2d 603, 605 (1st Cir.1980); *see also Thomas v. Arn,* 474 U.S. 140, 148–149, 106 S.Ct. 466, 471–472, 88 L.Ed.2d 435 (1985), *reh'g denied,* 474 U.S. 1111, 106 S.Ct. 899, 88 L.Ed.2d 933 (1986).

Dec. 22, 1997.

11. Even if the court were to consider other factors relevant to contract cases, it would not alter the above analysis. *See Clinton Hosp.,* 907 F.2d at 1263. First, the contract was signed by the parties in both Massachusetts and Florida, at their respective offices. The subject matter was located both in Florida, where the computers were manufactured, and Massachusetts, where the computers were delivered and resold. Also, Jabil's place of business was in Florida, but Datatrend's was in Massachusetts. Both agreements were negotiated in Florida and Massachusetts, where the respective parties were located. None of these factors weighs in favor of either party. The place of performance of the contract, however, was primarily Massachusetts. Both parties expected that the computers would be received and resold in Massachusetts and that returns would be handled by Datatrend in Massachusetts. This factor weighs in favor of Datatrend. Thus, on balance, consideration of these other factors slightly supports Datatrend's argument that Jabil's allegedly deceptive conduct occurred primarily and substantially in Massachusetts.

80

01-20-95 07:59PM   FROM Jabil Circuit        TO 9*6173261360        P001/007

# JABIL / DATATREND AGREEMENT

**DATE:**    1/20/95

**SELLER:**    JABIL CIRCUIT, INC
                10800 ROOSEVELT BLVD
                ST. PETERSBURG, FLORIDA  33716
                813-577-9749

**BUYER:**    MARK HANSON - PRESIDENT
                DATATREND COMPUTERS
                165 UNIVERSITY AVENUE
                WESTWOOD, MA    02090

DATATREND PURCHASE ORDER #:     _____

JABIL (SELLER) AND DATATREND (BUYER) HAVE AGREED TO ENTER INTO A BUSINESS AGREEMENT.

DATATREND WILL PURCHASE THE GENERIC NOTEBOOK PRODUCT AT THE AGREED TO QUANTITIES AND PRICES DEFINED ON PAGE 1 OF THIS AGREEMENT.   TERMS & CONDITIONS ARE DEFINED ON PAGE 2 OF THIS AGREEMENT.

PAYMENT FOR ALL NOTEBOOK PRODUCT IS C.O.D. AND F.O.B JABIL DOCK.

JABIL WILL PROVIDE DATATREND WITH DETAILED DELIVERY INFORMATION (PART NUMBER, QUANTITY, AND SHIP DATE) ON AN ONGOING BASIS UNTIL ALL NOTEBOOKS HAVE BEEN SHIPPED BY JABIL. DATATREND WILL PROVIDE A "CASH" PAYMENT TO JABIL FOR EACH SPECIFIED QUANTITY OF NOTEBOOK COMPUTERS READY FOR DELIVERY TO DATATREND   ALL DATATREND PAYMENTS WILL OCCUR PRIOR TO SHIPMENT AND WITHIN 48 HRS AFTER NOTIFICATION FROM JABIL THAT THE NOTEBOOKS ARE READY FOR SHIPMENT.

IN THE EVENT THAT JABIL NOTIFIES DATATREND THAT PRODUCT IS READY FOR DELIVERY TO DATATREND AND DATATREND IS UNABLE TO PROVIDE THE APPROPRIATE "CASH" FUNDS WITHIN THE 48 HR PAYMENT PERIOD,  DATATREND WILL PAY JABIL A LATE PURCHASE PENALITY OF 10% OF THE UNIT PRICE FOR ALL NOTEBOOKS AFFECTED.

IN THE EVENT THAT FULL "CASH" PAYMENT IS NOT MADE AVAILABLE TO JABIL WITHIN 3 WORKING DAYS FROM THE END OF THE 48 HR PAYMENT PERIOD.  ALL JABIL OBLIGATIONS OUTLINED IN THIS BUSINESS AGREEMENT ARE VOID,  RESULTING IN JABIL HAVING THE OPTION TO SELL ALL UNSOLD NOTEBOOK QUANTITIES  TO SOMEONE OTHER THAN DATATREND.

DATATREND (BUYER):   _____ ;   DATE: 1/20/95
                                AUTHORIZED SIGNATURE

JABIL  (SELLER):   _____ ;   DATE: 1/20/95
                            AUTHORIZED SIGNATURE

10800 Roosevelt Boulevard • St. Petersburg, Florida 33716 • Phone (813) 577-9749

**T & C'S**                                      Page 2 of 2

**1. Warranty -**
A. Parts Warranty Passed Thru To DTI Designated Service Provider
B. Spare Parts Inventory At Quantities per Attachment I
C. Complete Service Specifications Provided in Duplicate to DTI
D. Training for Two Service Providers Provided at Jabil Location
E. Notebooks Designated by DTI and/or its Designated Service Provider that are Determined to be
  Dead on Arrival May Be Returned to Jabil for repair or replacement, within 30 days after shipment to DTI
F. Fully warranted to be IBM compatible personal computers capable of running M.S DOS 6.2.2 and
  Windows 3.1. Such incompatibility will be counted as a D.O.A. failure.
G. Free from any inherent defects and cosmetic flaws.
H. Catastrophic Failure - In the event that DTI experiences more than a fifteen percent "catastrophic" field failure rate,
  within 90 days after delivery to DTI, DTI will have the option of:  Returning the failed product to Jabil for a cash refund, o
  Returning the failed product to Jabil for repair/replacement. Upon repair of the returned product, Datatrend will repurchase
  all product from Jabil for "fair market" value    Jabil has the option of declining Datatrend's repurchase
  offer and selling the repaired notebook product to another source.

  NOTE: A "catastrophic" failure is defined as a latent defect or design flaw inherent in all of the notebook product
        supplied to Datatrend by Jabil under this agreement, which has caused the "failed" notebooks to become inoperable.

**2. Delivery**
A. Delivery Schedule is per Attachment II.
B. DTI reserves the right to cancel this purchase order without recourse to Jabil if all product is not delivered
  to DTI by 5/1/95, due to Jabil non-performance.

**3. Certifications**
A. UL and CSA Approvals on both assembled notebook unit and power supply. Such registration numbers
  to be clearly listed on labels on the outside of each unit.
B. FCC Class B Certified on all notebook units. Such to be clearly listed on a label on the outside of each unit.
C. Recycling notices required for potentially hazardous material will be printed on any and all parts to
  ensure compliance with existing regulations and/or laws.

**4. Packaging**
A. Each unit will be packed in an individual plain, brown Box, such suitable for shipment through the United Parcel Service.
B. Each box will be clearly labeled with the model number, brief description and unit serial number.

**5. Software**
A. Jabil will download a software image as may be designated by DTI. DTI will supply the original copy of
  the software to be built into an image and downloaded. Jabil will be responsible for the integrity of the image.

**6. Other**
A. Functional/Physical Specifications - per Attachment III.

**7. Payment**
A.    C.O.D

Jabil/Datatrend  Notebook Project
Confidential Information

## APPENDIX B:

### Reset Agreement

04-26-95 08:12AM    FROM Jabil Circuit        TO 9*6173209154        P002/004
     APR-25-1995  09:51        DATATREND                    16173260090    P.22/04

TO: MARK HANSON

FROM: MARK MONDELLO

SUBJECT: RESET TO JABIL/DATATREND AGREEMENT: DATED 1/20/95

DATE: APRIL 24, 1995

REV.1

DATATREND AND JABIL HAVE AGREED THAT THE FOLLOWING AMENDMENTS/COMMENTS SHALL APPLY TO OUR ORIGINAL BUSINESS AGREEMENT SIGNED ON 1/20/95.

* **SHIPMENTS**

AS OF 4\23\95, JABIL HAS SHIPPED 2656 PRODUCTION NOTEBOOKS TO DATATREND. DATATREND HAS RETURNED 895 NOTEBOOKS TO JABIL, LEAVING A BALANCE OF 1761 NOTEBOOKS AT DATATREND. DATATREND HAS PAID $2,175,845 TO JABIL FOR THE 1761 NOTEBOOKS REMAINING AT DATATREND, RESULTING IN "PAYMENT IN FULL". a BALANCE OF 2761 NOTEBOOKS REMAIN TO BE SHIPPED FROM JABIL TO DATATREND. A "ROUGH BUILDOUT PLAN IS SHOWN IN ATTACHMENT "I".

* **RMAS**

TO REITERATE, DATATREND HAS PAID FOR ALL 1791 NOTEBOOKS IN FULL. JABIL HAS AGREED TO SUPPORT DATATREND WITH ALL RMAS THROUGHOUT THE BUILDOUT OF THE NOTEBOOKS.

* **UNIT PRICING**

THE UNIT PRICING FOR THE BALANCE OF 2761 NOTEBOOKS REMAINING TO BE SHIPPED TO DATATREND IS SHOWN IN ATTACHMENT II. THE PRICE REVISION OF $498,375 REFLECTED IN ATTACHMENT II IS A CREDIT TO DATATREND, $140,000 OF WHICH RELATES TO UNITS SOLD BY DATATREND AS OF 3/31/95.

* **INDEPENDENT BACK END SUPPORT**

JABIL & DATATREND HAVE AGREED TO USE AND INDEPENDENT COMPANY (SUCH AS MEMOREX) FOR BACK END TECHNICAL FIELD SUPPORT WHEN REQUIRED. THE SELECTED COMPANY WILL INVOICE DATATREND FOR ALL EXPENSES. DATATREND WILL PROVIDE JABIL WITH DETAILED BACK UP & VERIFICATION OF BACKEND EXPENSES AS COSTS ARE REALIZED. JABIL WILL REIMBURSE DATATREND FOR BACK END TECHNICAL SUPPORT. JABIL'S LIABILITY SHALL NOT EXCEED $50,000 IN TOTAL.

JABIL SIGNATURE _____ DATE

DATATREND SIGNATURE _____ DATE 24-Ap-95